$292,000.

b.   On or about January 25, 2005, AHMED, at the direction of TAHIR ALI KHAN, opened a bank account at New York Community Bank in the name "Munir Lodhi."

c.   On or about February 9, 2007, MOHAMMAD ISHAQ, a/k/a "Saqa," and GHULAM MEHMOOD, a/k/a "Mama," a/k/a "Zafar," the defendants, discussed paying $3,000 to OSCAR SANCHEZ, a/k/a "Charsi," a/k/a "Bank of America," the defendant, and an unspecified amount of money to the PRADIPT SHARMA, a/k/a "the Citibank guy," the defendant, for their assistance in opening bank accounts.

d.   On or about February 17, 2005, AHMED, at the direction of TAHIR ALI KHAN, withdrew money in Manhattan from a Citibank account in the name of "Munir Lodhi."

e.   On or about September 5, 2006, MEHMOOD and SANCHEZ caused an application for a $100,000 bank loan to be filed in the name of "Mohammad Mir," and the name of a shell corporation, "Lagi Grocery," at a Bank of America branch located in downtown Manhattan, where SANCHEZ worked.  MEHMOOD provided SANCHEZ with fraudulent paperwork and means of identification for "Mohammad Mir" to include in the application.

f.   On or about October 3, 2006, MEHMOOD asked ISHAQ to check what address had been used in the corporate paperwork for Lagi Grocery, and SANCHEZ told MEHMOOD that he

26

hoped they hadn't messed up the address in the loan documents.

g.    On or about October 3, 2006; October 13, 2006; October 16, 2006; October 19, 2006; and October 20, 2006, MEHMOOD pretended to be a person named "Mohammad Mir" during conversations with a Bank of America employee about a loan application and checking account.

h.    On or about October 8, 2006, MEHMOOD told SYED SHAH, a/k/a "Faisal," a/k/a "Chotu," a/k/a "Joji," the defendant, to have a checking account opened in the name of a sham business, in order to deposit the loan money if it was approved.  SHAH asked if MEHMOOD was talking about the "Mohammad Mir" loan application, and MEHMOOD confirmed that he was.

i.    On or about October 16, 2006, a Bank of America employee told MEHMOOD -- who was impersonating "Mohammad Mir" -- that his loan had been approved for $35,000, and that a debit card would be mailed out shortly.

j.    On or about October 16, 2006, SANCHEZ told MEHMOOD over the phone that he was disappointed MEHMOOD had been approved only for $35,000, and that they should have the money moved into a checking account as soon as possible.

k.    On or about February 14, 2007, SHARMA, an employee of Citibank, obtained from SHAH and MEHMOOD the means of identification of numerous fraudulent identities to be used in opening bank accounts at Citibank.

27

l.    On or about February 16, 2007, ISHAQ gave
SHAH the names, driver's license identification numbers, and
dates of birth of various fraudulent identities, to use in
opening bank accounts for those identities.

m.    On or about February 15, and 16, 2007, SHARMA
caused numerous bank accounts to be opened at a Citibank branch
in Manhattan in the names of fraudulent identities given to him
by SHAH and MEHMOOD, including but not limited to, "Ibrahima
Diakhate" and "Jameel Choudhrey."

n.    On or about February 17, 2007, SHARMA
reported to SHAH that all of the accounts had been opened, except
for the one account application in the "Spanish name," because
the information provided was the same as for another account.
SHAH replied, "Okay, we will do that later on. . . . Thank you,
brother SHARMA."

o.    On or about May 25, 2007, MEHMOOD told SHAH
that he had done a $10,000 balance transfer under the fraudulent
identity of "Velikov" [i.e., "Dimo Velikov," a fraudulent
identity used by the defendants].  MEHMOOD then corrected himself
and stated that the bank transfer was for the "Asgharam" [i.e.,
"Khurram Asgharam," another fraudulent identity used by the
defendants].

p.    On or about May 28, 2007, MEHMOOD told SHAH
to make a false identification document for "Khurram," [i.e.

28

"Khurram Asgharam"] that would be used to open an account for "Khurram" through SANCHEZ.

q.    On or about June 8, 2007, MEHMOOD reported to TAHIR ALI KHAN that they had received the checkbook for the bank account opened in "Khurram's" name.

r.    On or about July 3, 2007, TAHIR ALI KHAN asked MEHMOOD to go to Bank of America and deposit $1,000 in the account of "Ali Haiber," a fraudulent identity.    KHAN gave MEHMOOD the account number over the telephone.    MEHMOOD asked KHAN whether the account was "of a chicken" and KHAN confirmed that it was.

(Title 18, United States Code, Section 1349.)

COUNT EIGHT

(Bank Fraud)

The Grand Jury further charges:

16.    From in or about August 2006, up to and including in or about October 2006, in the Southern District of New York and elsewhere, TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji," a/k/a "Shan," MUHAMMAD ISHAQ, a/k/a "Saqa," GHULAM MEHMOOD, a/k/a "Mama," a/k/a "Zafar," OSCAR SANCHEZ, a/k/a "Charsi," a/k/a "Bank of America," SYED SHAH, a/k/a "Faisal," a/k/a "Chotu," a/k/a "Joji," and PRADIPT SHARMA, a/k/a "the Citibank guy," the defendants, unlawfully, willfully, and knowingly did execute and attempt to execute a scheme and

29

artifice to defraud a financial institution, the deposits of
which were then insured by the Federal Deposit Insurance
Corporation, and to obtain moneys, funds, credits, assets, and
other property owned by, and under the custody and control of,
such financial institution, by means of false and fraudulent
pretenses, representations, and promises, to wit, TAHIR ALI KHAN,
ISHAQ, MEHMOOD, SANCHEZ, SHAH, and SHARMA used fraudulent
identities and associated sham business identities to open bank
accounts and obtain bank loans from banks, including Citibank,
Bank of America, and Washington Mutual, while intending to
default on the loans and keep the proceeds.

(Title 18, United States Code, Sections 1344 & 2.)

## COUNT NINE

### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

17.  From in or about October 2006, through in or about
August 2007, in the Southern District of New York and elsewhere,
TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji,"
a/k/a "Shan," ARIE BENSHIMON, a/k/a "the Jew," a/k/a "Jewish
Guy," GHULAM MEHMOOD, a/k/a "Mama," a/k/a "Zafar," and SHAHEEN
MUKHTAR, a/k/a "Nick," the defendants, and others known and
unknown, unlawfully, willfully, and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit wire fraud, as that term is defined in Title 18, United

30

States Code, Section 1343.

18.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

Sale of the 53 Regan Lane Property<br>to the "Mohammad Mir" Identity

a.   In or about October 2006, TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji," a/k/a "Shan," GHULAM MEHMOOD, a/k/a "Mama," a/k/a "Zafar," and SHAHEEN MUKHTAR, a/k/a "Nick," the defendants, conspired to sell MUKHTAR's home at 53 Regan Lane in Voorhees, New Jersey (the "53 Regan Lane property") to a fraudulent identity in the name of "Mohammed Mir," and caused a mortgage loan application to be filed in the borrower name of "Mohammad Mir."

b.   On or about October 30, 2006, MUKHTAR, who was in New Jersey, spoke by telephone with TAHIR ALI KHAN, who was in Alabama, and asked KHAN to fax the "license" for "Mir" to his fax number in New Jersey.  MUKHTAR instructed KHAN to fax him the one where the picture can be seen a little bit but could not be recognized.

c.   On or about October 30, 2006, TAHIR ALI KHAN told MEHMOOD to fax "Mir's ID."  MEHMOOD stated that he had not yet put a photograph on the license.

d.    On or about October 30, 2006, MUKHTAR told
TAHIR ALI KHAN he could not read the fax, and asked TAHIR ALI
KHAN to send it overnight.  MUKHTAR told KHAN how he made the
"Mir signature."

e.    On or about November 4, 2006, TAHIR ALI KHAN
told MEHMOOD he had spoken to MUKHTAR about an upcoming real
estate closing.  MEHMOOD asked whether they had used the
fraudulent identity "of Imtiaz" and KHAN responded that they had
used the fraudulent identity of "Mir" instead.  MEHMOOD told KHAN
he had not yet been able to find somebody for the "Mir" picture
and could not find a picture to paste.  MEHMOOD said he would ask
another individual to send a picture of "Baba."

f.    On or about November 8, 2006, MUKHTAR, TAHIR
ALI KHAN, and MEHMOOD caused a mortgage lender to issue a notice
of loan approval, approving a home mortgage in the amount of
$496,000 for "Mohammad I. Mir" to purchase the 53 Regan Lane
property.

g.    On or about November 9, 2006, MUKHTAR told
TAHIR ALI KHAN that they "need his social papers, for Mir."
MUKHTAR asked KHAN if he could "do the social" and KHAN stated
that he would try.

h.    On or about November 10, 2006, TAHIR ALI KHAN
told MUKHTAR that he was having a problem "making the 9 numbers"
(i.e., the social security card) because he couldn't find an "M"

32

anywhere, but that he would try using a "W" and turning it upside down.

        i.   On or about November 13, 2006, MUKHTAR asked TAHIR ALI KHAN whether "Mir" was a citizen or had a green card. KHAN responded that "Mir" had nothing, but that, if MUKHTAR wanted a copy of a green card or citizenship papers, KHAN "will make it."

        j.   On or about December 6, 2006, MUKHTAR, MEHMOOD, and TAHIR ALI KAHN, caused Citi Home Equity to approve a home equity line of credit in the approximate amount of $92,900 to "Mohammad I. Mir," for purchase of the 53 Regan Lane property.

        k.   On or about December 8, 2006, MUKHTAR told TAHIR ALI KHAN that the house was worth approximately $620,000. KHAN told MUKHTAR to make a bank statement and to keep in mind that they had to have enough money to make the payments for the first three or four months. KHAN told MUKHTAR to use "the one being made for Washington Mutual" and to change the name but leave everything else the same.

        l.   On or about December 13, 2006, MEHMOOD told TAHIR ALI KHAN that documentation for a home equity line of credit had arrived from Citibank for "Mir."

        m.   On or about December 18, 2006, MUKHTAR and TAHIR ALI KHAN conspired for KHAN to impersonate the employer of "Mohammad Mir" for purposes of providing an employment

33

verification for "Mir" in connection with "Mir's" mortgage application.  MUKHTAR gave KHAN employment information for "Mir" as "Selon Construction, Inc." and told KHAN to impersonate the general manager, and to say that Mir had been working there since March 2003 and made $15-$20,000 per month.

        n.   On or about December 27, 2006, TAHIR ALI KHAN told MEHMOOD that tomorrow was the day for MUKHTAR's real estate closing.  MEHMOOD said he would give "Baba" hair dye to use, and that MEHMOOD would go with them.

        o.   On or about December 28, 2006, MEHMOOD, MUKHTAR, and their co-conspirators, attended a real estate closing for the 53 Regan Lane property in New Jersey, during which time the property was sold from MUKHTAR to "Mohammad Mir." During and after the closing, MEHMOOD and MUKHTAR, who were in New Jersey, repeatedly telephoned TAHIR ALI KHAN, who was in Manhattan, and updated KHAN on the progress of the closing.

        p.   On or about December 28 and 29, 2006, TAHIR ALI KHAN and MUKHTAR discussed how the money from the closing would be divided and deposited into various bank accounts.

        q.   In or about May 2007, MUKHTAR, TAHIR ALI KHAN, and MEHMOOD caused a default on the mortgage loans obtained in the name "Mohammad Mir" for the 53 Regan Lane property.

34

Attempted Sale of the 71st Street
Property to the "Mohammad Mir" Identity

r.   On or about October 26, 2006, TAHIR ALI KHAN
called ARIE BENSHIMON, a/k/a "the Jew," a/k/a "Jewish guy," the
defendant, and told him about "Mohammad Mir" and asked whether
BENSHIMON had more properties.

s.   On or about November 10, 2006, BENSHIMON
called a mortgage broker in Rockland County, New York, and
provided the name, date of birth, and social security number, for
the identity of "Mohammad Mir," representing that "Mir" was an
interested new buyer for "71st Street in Brooklyn" [i.e., 1467
71st Street, Brooklyn, New York, hereafter, the "71st Street
property"].  BENSHIMON further represented that "Mir" was self-
employed and owned a grocery store in Brooklyn, and that he
needed 106% financing.

t.   On or about November 13, 2006, a mortgage
broker in Rockland County, New York, called BENSHIMON, stating
that they had completed their credit check on "Mir."

u.   On or about November 15, 2006, BENSHIMON
called the mortgage broker and told the broker to set up the
contract for the "71st Street" property.  BENSHIMON stated that
the buyer was "Mohammad Mir" and that the seller was BENSHIMON's
corporation.  The mortgage broker stated that they would need to
get "Mir's" home phone number, date of birth, work verification,
driver's license, and a business license or accountant's letter

35

because "Mir" was self-employed.

        v.  On or about December 4, 2006, BENSHIMON arranged for TAHIR ALI KHAN to impersonate the Lagi Grocery business listed as "Mir's" place of employment.  BENSHIMON stressed that KHAN should say that "Mir" was an importer and wholesaler for the company, not the owner, to avoid having to submit additional corporate papers required for individuals who are self-employed.

        w.  On or about December 9, 2006, BENSHIMON caused a "Uniform Residential Loan Application" in the name of "Mohammad Mir" to be submitted to a mortgage broker in Rockland County, requesting a mortgage loan in the amount of $592,000, so that "Mohammad Mir" could purchase the "71st Street Property."

        x.  On or about January 3, 2007, the underwriter of a mortgage lender in Illinois telephoned the New York telephone number (718 area code) listed in the "Mir" loan application as the number for "Lagi Grocery," to verify "Mir's" employment.  The underwriter spoke to MEHMOOD, who pretended to be the place of employment of "Mohammad Mir."

        y.  On or about January 3, 2007, BENSHIMON called TAHIR ALI KHAN complaining that whoever picked up the phone to verify "Mir's" employment was a "moron" because he told the woman that "Mir" was "a very important man," when he was supposed say that "Mir" was "in import, exports."

Attempted Sale of the 71st Street
Property to the "Malik Nawaz" Identity

z.  On or about June 4, 2007, TAHIR ALI KHAN and
BENSHIMON discussed the "Malik thing."  KHAN stated that the
history for "Malik" was approximately five years old, and that he
wanted to buy just one house for now.

aa.  On or about June 8, 2007, TAHIR ALI KHAN gave
BENSHIMON the means of identification for "Malik Nawaz,"
including name, social security, and date of birth.  KHAN stated
"you're going to like him."

bb.  On or about June 10, 2007, BENSHIMON told
MEHMOOD that he was submitting four or five applications for
"Malik" and that they could get the loan for him quickly because
his credit score was so high.  BENSHIMON asked MEHMOOD if "Malik"
had a bank statement, and MEHMOOD responded, "He has a bank
account in Bank of America.  We just opened it."

cc.  On or about June 10, 2007, BENSHIMON told
TAHIR ALI KHAN that "Malik . . . is the best one I ever saw!
. . . I was like shit I can do whatever I want with him."  KHAN
responded, "[as] long as we are making money, my brother."
BENSHIMON then asked KHAN for bank statements for the "Malik
Nawaz" identity, stating if KHAN gave him copies of six months of
statements, he (BENSHIMON) would make the rest.

dd.  On or about June 14, 2007, TAHIR ALI KHAN and
BENSHIMON discussed who would make twelve months of bank

37

statements for "Malik Nawaz."

ee.  On or about June 15, 2007, TAHIR ALI KHAN and BENSHIMON discussed what information should be included in "Malik Nawaz's" bank statements, and BENSHIMON instructed that the statements should show at least $15,000 in monthly deposits, as well as checks for $2,700 drawn on the same date between the first and sixth of each month to make it look like rent was being paid.  KHAN stated that the person making the bank statements for them was using the same program that KHAN and BENSHIMON used to use.

ff.  On or about June 17, 2007, TAHIR ALI KHAN told MEHMOOD that the bank statements were made and are ready to give to BENSHIMON.

gg.  On or about June 19, 2007, BENSHIMON told MEHMOOD to pretend to be the company listed in "Nawaz's" loan application when he received a call for employment verification. MEHMOOD stated that, "yeah I can sound like a business." BENSHIMON gave MEHMOOD the name and address of the company, and told him to state that "Nawaz" was the owner of the company.

hh.  On or about June 20, 2007, BENSHIMON caused a loan application in the name of "Malik Nawaz" to be submitted to Saxon Mortgage, a subsidiary of Morgan Stanley, which is headquartered in Manhattan, requesting a mortgage loan in the amount of $750,000 to purchase the "71st Street property."

38

ii.  On or about June 29, 2007, BENSHIMON informed TAHIR ALI KHAN that there were problems with the loan because the balances in the bank statements that were submitted did not add up correctly, and that something had gone wrong when the bank called for employment verification.  BENSHIMON stated to KHAN that, in the future, he wanted to be the person to answer the telephone for employment verification calls.

(Title 18, United States Code, Section 1349.)

### COUNT TEN

#### (Wire Fraud)

The Grand Jury further charges:

19.  From in or about October 2006, through in or about March 2007, in the Southern District of New York and elsewhere, TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji," a/k/a "Shan," ARIE BENSHIMON, a/k/a "the Jew," a/k/a "Jewish Guy," GHULAM MEHMOOD, a/k/a "Mama," a/k/a "Zafar," and SHAHEEN MUKHTAR, a/k/a "Nick," the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, KHAN, BENSHIMON, MEHMOOD, and MUKHTAR, in furtherance of their

scheme to obtain home mortgages in the names of fraudulent identities, made and caused to be made numerous interstate telephone calls, including but not limited to telephone calls on or about December 28, 2006, between New York and Manhattan.

(Title 18, United States Code, Sections 1343 and 2.)

COUNT ELEVEN

(Conspiracy to Commit Money Laundering)

The Grand Jury further Charges:

20.   From at least in or about October 2006, up to and including in or about August 2007, in the Southern District of New York and elsewhere, NAVEED ALI BHINDAR, a/k/a "Sheikh," GHULAM MEHMOOD, a/k/a "Mama," a/k/a "Zafar," and SYED SHAH, a/k/a "Faisal," a/k/a "Chotu," a/k/a "Joji," the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense of Title 18, United States Code, Section 1956.

21.   It was a part and an object of the conspiracy that NAVEED ALI BHINDAR, a/k/a "Sheikh," GHULAM MEHMOOD, a/k/a "Mama," a/k/a "Zafar," SYED SHAH, a/k/a "Faisal," a/k/a "Chotu," a/k/a "Joji," the defendants, and others known and unknown, unlawfully, willfully, and knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of

40

unlawful activity, to wit, the proceeds of criminal offenses charged in Counts One through Ten of this Indictment, with the intent to promote the carrying on that unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of that unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and (B)(i).

<u>Means and Methods of the Conspiracy</u>

22. Among the means and methods by which NAVEED ALI BHINDAR, a/k/a "Sheikh," GHULAM MEHMOOD, a/k/a "Mama," a/k/a "Zafar," and SYED SHAH, a/k/a "Faisal," a/k/a "Chotu," a/k/a "Joji," the defendants, and their co-conspirators, would and did carry out the conspiracy were the following:

a. MEHMOOD and SHAH transferred money obtained through fraud committed in fraudulent names into bank accounts opened in fraudulent names;

b. MEHMOOD and SHAH gave BHINDAR checks drawn on the fraudulent bank accounts, made payable to BHINDAR's businesses;

c. after receiving the checks, BHINDAR gave MEHMOOD and SHAH cash, keeping a percentage of the value of the checks for himself.

41

Overt Acts

23.   In furtherance of this conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about October 15, 2006, NAVEED ALI BHINDAR, a/k/a "Sheikh," the defendant, caused a $6,000 check, drawn on a Bank of America account in the fraudulent name of "Kadir Ahmed," and made payable to his business, "Kings Corner Mini Mart," to be deposited into his bank account.

b.   On or about January 18, 2007, BHINDAR caused two checks totaling $8,000, drawn on a Bank of America account in Manhattan in the fraudulent name of "Mohammad Mir," and made payable to BHINDAR's business, "301 King Grocery," to be deposited into his bank account.

c.   On or about February 4, 2007, BHINDAR, SYED SHAH, a/k/a "Faisal," a/k/a "Chotu," a/k/a "Joji," and GHULAM MEHMOOD, a/k/a "Mama," a/k/a "Zafar," the defendants, discussed in a telephone call the total outstanding amount that BHINDAR owed.  BHINDAR advised that he owed them five thousand dollars and had finished "[t]he last check."

d.   On or about February 7, 2007, BHINDAR complained to MEHMOOD that the "work" from MEHMOOD was slow, and that if MEHMOOD brought him "work," then "don't worry, we pay cash."

42

e.    On or about February 26, 2007, SHAH informed BHINDAR that he had deposited $9,000 in checks into BHINDAR's accounts.

f.    On or about June 13, 2007, MEHMOOD told SHAH that he was going to give a $30,000 check to BHINDAR and "get some cash from him."

g.    On or about June 16, 2007, SHAH told MEHMOOD to give checks to BHINDAR because BHINDAR charges "only ten percent."

h.    On or about June 17, 2007, MEHMOOD told BHINDAR that he had "up to $9,000" in checks to give him, and that BHINDAR should give him "large dollars, not small."  BHINDAR said okay, and discussed with MEHMOOD the different business accounts he had into which checks could be deposited.

i.    On or about June 21, 2007, SHAH informed MEHMOOD that he had written checks to "301 Kings Highway Grocery" and "Kings Corner Minimart," BHINDAR's businesses.  MEHMOOD told SHAH to pick up $9,500 from BHINDAR that day in "big bills."

(Title 18, United States Code, Section 1956(h).)

## COUNT TWELVE

### (Money Laundering)

The Grand Jury further charges:

24.   From at least in or about October 2006, up to and including in or about August 2007, in the Southern District of New York and elsewhere, NAVEED ALI BHINDAR, a/k/a "Sheikh,"

43

GHULAM MEHMOOD, a/k/a "Mama," a/k/a "Zafar," SYED SHAH, a/k/a "Faisal," a/k/a "Chotu," a/k/a "Joji," the defendants, and others known and unknown, unlawfully, willfully, and knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of unlawful activity, to wit, the criminal offenses charged in Counts One through Ten of this Indictment, with the intent to promote the carrying on that unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of that unlawful activity, to wit, BHINDAR, MEHMOOD, and SHAH laundered thousands of dollars in fraud crime proceeds by cashing checks drawn on fraudulent bank accounts in Manhattan through BHINDAR's businesses in Brooklyn.

(Title 18, United States Code, Section 1956(a)(1)(A)(i) and (B)(i), and 2.)

## COUNT THIRTEEN

### (Conspiracy to Transport and Sell Stolen Vehicles)

The Grand Jury further Charges:

25.  From at least in or about October 2006, up to and including in or about August 2007, in the Southern District of New York and elsewhere, TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji," a/k/a "Shan," SYED HASSAN, FRANKLIN

44

RODRIGUEZ, a/k/a "Spanish Guy," a/k/a "Chancey," and BASHARAT
JARRAL, a/k/a "Alex," the defendants, and others known and
unknown, unlawfully, willfully, and knowingly did combine,
conspire, confederate and agree together and with each other to
commit an offense against the United States, to wit, to violate
Title 18, United States Code, Sections 2312 and 2313.

      26.  It was a part and an object of the conspiracy that
TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji,"
a/k/a "Shan," SYED HASSAN, FRANKLIN RODRIGUEZ, a/k/a "Spanish
Guy," a/k/a "Chancey," and BASHARAT JARRAL, a/k/a "Alex," the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly would and did transport in interstate and foreign
commerce motor vehicles, knowing the same to have been stolen, in
violation of Title 18, United States Code, Section 2312.

      27.  It was a part and an object of the conspiracy that
TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji,"
a/k/a "Shan," SYED HASSAN, FRANKLIN RODRIGUEZ, a/k/a "Spanish
Guy," a/k/a "Chancey," and BASHARAT JARRAL, a/k/a "Alex," the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly would and did receive, possess, conceal, store,
barter, sell, and dispose of motor vehicles, which had crossed a
State and United States boundary, after being stolen, knowing the
same to have been stolen, in violation of Title 18, United States
Code, Section 2313.

<u>Overt Acts</u>

28.  In furtherance of this conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

<u>The Stolen Blue Hummer</u>

a.  On or about February 9, 2007, TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji," a/k/a "Shan," and FRANKLIN RODRIGUEZ, a/k/a "Spanish Guy," a/k/a "Chancey," the defendants, caused a blue Hummer ("the Hummer") to be stolen from Queens, New York.

b.  On or about February 10, 2007, TAHIR ALI KHAN and BASHARAT JARRAL, a/k/a "Alex," the defendants, discussed selling the Hummer to SYED HASSAN, the defendant, for $24,000, and having it shipped abroad.

c.  On or about February 10, 2007, TAHIR ALI KHAN told RODRIGUEZ that he wanted to show the Hummer to the buyer but could not do so because there was still no key for the Hummer.

d.  On or about February 11, 2007, TAHIR ALI KHAN met with HASSAN, in HASSAN's car at a parking lot in Brooklyn to arrange the sale of the Hummer.  After the meeting, KHAN called RODRIGUEZ to report that HASSAN, "the buyer," had given him money for the Hummer.

e.  On or about February 12, 2007, RODRIGUEZ drove the Hummer from Queens to Manhattan, via the Triboro Bridge

46

and the FDR Drive, to a garage where the license plates and
vehicle identification number ("VIN") on the stolen Hummer were
changed.

f.    On or about February 12, 2007, a co-
conspirator not named herein drove the blue Hummer from Manhattan
to an international shipping business in New Jersey, for
transport outside the United States.

The Stolen White Hummer Stretch Limousine

g.    On or about February 11, 2007, TAHIR ALI KHAN
told JARRAL that he had met with HASSAN, who seemed to be a good
buyer, and had spoken to HASSAN about the "Stretch Hummer" as
well.

h.    On or about February 14, 2007, TAHIR ALI
KHAN, RODRIGUEZ, and conspirators not named herein, caused a
white hummer stretch limousine (the "limousine") to be stolen
from Queens, New York.

i.    On or about February 21, 2007, RODRIGUEZ
informed TAHIR ALI KHAN that the "limousine" had been transported
to an international shipping business in New Jersey.

j.    On or about February 21, 2007, KHAN told
RODRIGUEZ to submit shipping paperwork for the limousine under
the name "Wasim."

k.    On or about February 23, 2007, TAHIR ALI KHAN
and JARRAL discussed selling the limousine for $45,000, although
stating that it was actually worth $100,000 to $150,000.  KHAN

47

stated that the limousine was at the port, ready for shipment to England.

l.   On or about February 26, 2007, after learning that the limousine had been seized by the local police, RODRIGUEZ and TAHIR ALI KHAN discussed that the limousine must have been equipped with Lo-Jack, and debated whether certain individuals may have reported them to the police.

m.   On or about February 28, 2007, RODRIGUEZ called the internal shipping business, impersonating "Wasim," and tried to get back the money paid to ship the limousine abroad.

### The Stolen Black Cadillac Escalade

n.   On or about November 1, 2006, JARRAL and TAHIR ALI KHAN planned to make a fraudulent receipt for supposed car repairs to a black Cadillac Escalade (the "Escalade"), which had already been shipped from the United States to England.  In a telephone call, KHAN explained to JARRAL that the Escalade was shipped with a "salvage" title, but appeared to be in good condition because "when it was initially stolen," only the lights were changed, and that was now causing a problem.  JARRAL agreed to make a sham receipt in which they listed repairs that could not be verified.

### The Porsche Cayenne

o.   On or about July 13, 2007, TAHIR ALI KHAN told HASSAN that he had a 2005 Porsche Cayenne.

48

p.    On or about July 26, 2007, RODRIGUEZ picked TAHIR ALI KHAN up at the airport in a 2005 silver Porsche Cayenne containing an invalid and fraudulently altered vehicle identification number ("the Porsche").

q.    On or about July 26, 2007, RODRIGUEZ and TAHIR ALI KHAN drove the Porsche to a street in Brooklyn, where they switched the license plates on the Porsche.  KHAN then drove the Porsche from Brooklyn to New Jersey, and later back to JARRAL's garage in Brooklyn.

r.    On or about July 26, 2007, BASHARAT drove the Porsche from Brooklyn to the Bronx, where he met HASSAN, and gave the Porsche to HASSAN.

<u>The Shipping of HASSAN's Cars</u>

s.    On or about February 10, 2007, TAHIR ALI KHAN and HASSAN agreed that, to avoid any problem, they would ship the stolen vehicle that KHAN had sold to HASSAN separately from the vehicle in HASSAN's real name.

t.    On or about May 4, 2007, HASSAN and TAHIR ALI KHAN conspired to ship cars internationally under a false name. HASSAN told KHAN that a co-conspirator not named herein did not want the paperwork in his real name, because KHAN had told him where the cars came from and now the co-conspirator was "scared."

u.    On or about May 7, 2007, in a telephone call between HASSAN and TAHIR ALI KHAN, HASSAN volunteered to make shipping paperwork with his scanner and Photoshop software, if

49

KHAN provided the name to be used.

(Title 18, United States Code, Section 371.)

### COUNT FOURTEEN

### (Transportation of Stolen Vehicles)

The Grand Jury further charges:

29.  From in or about October 2006 through in or about August 2007, in the Southern District of New York and elsewhere, TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji," a/k/a "Shan," SYED HASSAN, FRANKLIN RODRIGUEZ, a/k/a "Spanish Guy," a/k/a "Chancey," and BASHARAT JARRAL, a/k/a "Alex," the defendants, and others known and unknown, unlawfully, willfully and knowingly, did transport in interstate and foreign commerce motor vehicles, knowing the same to have been stolen, to wit, TAHIR ALI KHAN, HASSAN, RODRIGUEZ, and JARRAL participated in a stolen car ring, as part of which they transported stolen vehicles within the United States and abroad.

(Title 18, United States Code, Sections 2312 and 2).

### COUNT FIFTEEN

### (Possession and Sale of Stolen Vehicles)

The Grand Jury further charges:

30.  From at least in or about October 2006 through in or about August 2007, in the Southern District of New York and elsewhere, TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji," a/k/a "Shan," SYED HASSAN, FRANKLIN RODRIGUEZ, a/k/a "Spanish Guy," a/k/a "Chancey," and BASHARAT JARRAL, a/k/a

"Alex," the defendants, and others known and unknown, unlawfully, willfully and knowingly, did receive, possess, conceal, store, barter, sell, and dispose of motor vehicles, which have crossed a State or United States boundary after being stolen, knowing the same to have been stolen, to wit, TAHIR ALI KHAN, HASSAN, RODRIGUEZ, and JARRAL participated in a stolen car ring as part of which they received, possessed, concealed, stored, and sold stolen cars.

(Title 18, United States Code, Sections 2313 and 2).

COUNT SIXTEEN

(Immigration Document Fraud)

The Grand Jury further charges:

31. From in or about December 2000, up to and including in or about August 2007, in the Southern District of New York and elsewhere, TAHIR ALI KHAN, a/k/a "Waheed Khan," a/k/a "Ali," a/k/a "Haji," a/k/a "Shan," the defendant, used, attempted to use, possessed, obtained, accepted, and received a document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to have been procured by fraud and unlawfully obtained, and when applying for an immigrant or non-immigrant visa, permit, and other document required for entry into the United States, and for admission to the United States, the defendant also personated another, and evaded and attempted to evade the immigration laws by appearing under an assumed name

without disclosing his true identity, to wit, TAHIR ALI KHAN
fraudulently obtained a permanent resident alien card in the year
2000 by personating the identity of "Waheed Khan," and thereafter
used the "Waheed Khan" permanent resident alien card to, among
other things, obtain additional documentation for "Waheed Khan"
from the Pakistani Consulate in Manhattan and petition for
immigration status for his wife based upon his fraudulently
obtained "Waheed Khan" immigration status.

(Title 18, United States Code, Section 1546(a).)

FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH TWELVE

1.    As a result of committing the offenses alleged in
Counts One through Twelve of this Indictment, defendants TAHIR
ALI KHAN, FAYYAZ AHMED, ARIE BENSHIMON, NAVEED ALI BHINDAR,
MOHAMMAD ISHAQ, NADEEM KHAN, GHULAM MEHMOOD, SHAHEEN MUKHTAR,
QAISER QURESHI, OSCAR SANCHEZ, SYED SHAH, and PRADIPT SHARMA
shall forfeit to the United States pursuant to 18 U.S.C. §§ 981,
982, and 28 U.S.C. § 2461(c) any property constituting or derived
from proceeds obtained directly or indirectly as a result of the
offenses, including but not limited to at least $10 million in
United States currency, in that such sum in aggregate is property
representing the amount of proceeds obtained as a result of the
offenses for which the defendants are jointly and severally
liable.

<u>FORFEITURE ALLEGATION AS TO COUNTS THIRTEEN THROUGH FIFTEEN</u>

       2.    As a result of committing the offenses alleged in Counts Thirteen through Fifteen of this Indictment, defendants TAHIR ALI KHAN, SYED HASSAN, BASHARAT JARRAL, AND FRANKLIN RODRIGUEZ shall forfeit to the United States pursuant to 18 U.S.C. § 982, any property constituting or derived from proceeds obtained directly or indirectly as a result of the offenses.


_____    _____
FOREPERSON                      MICHAEL J. GARCIA
                                  United States Attorney

53

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

**- v. -**

**TAHIR ALI KHAN**, a/k/a "Waheed Khan," a/k/a "Ali,"
a/k/a "Haji," a/k/a "Shan," **FAYYAZ AHMED, ARIE
BENSHIMON**, a/k/a "the Jew," a/k/a "Jewish Guy,"
**NAVEED ALI BHINDAR**, a/k/a "Sheikh," **SYED
HASSAN, MUHAMMAD ISHAQ**, a/k/a "Saqa,"
**BASHARAT JARRAL**, a/k/a "Alex," **NADEEM KHAN,
GHULAM MEHMOOD**, a/k/a "Mama," a/k/a "Zafar,"
**SHAHEEN MUKHTAR**, a/k/a "Nick," **QAISER
QURESHI**, a/k/a "Auntie," **FRANKLIN RODRIGUEZ,**
a/k/a "Spanish Guy," a/k/a "Chancey," **OSCAR
SANCHEZ**, a/k/a "Charsi," a/k/a "Bank of America,"
**SYED SHAH**, a/k/a "Faisal," a/k/a "Chotu," a/k/a "Joji,"
**PRADIPT SHARMA**, a/k/a "the CitiBank guy,"

**Defendants.**

### INDICTMENT

S1 07 CR 711

(Title 18, United States Code, Sections 371, 1028(a)(1),
(a)(7) and (f), 1028A(a)(1), 1029(a)(2) and (b)(2), 1343,
1344, 1349, 1956(a) and (h), 2312, 2313, 1546(a) and 2)

Michael J. Garcia
United States Attorney.

**A TRUE BILL**

Foreperson.